## In re ANTILA'S ESTATE.

1. Wills—Testamentary Capacity—Property.
   Testamentary capacity requires an understanding of the disposition being made of the property at the time the will is executed.

2. Same—Mental Capacity—Evidence.
   Finding of trial judge that 56-year-old spinster whose ability to understand English was limited and who had suffered a paralytic stroke somewhat less than 2 weeks prior to execution of purported will did not have the requisite mental capacity to make a will *held*, supported by very strong and probative testimony, including that of experienced physician who attended her for remainder of her life commencing 5 days after instrument was executed.

3. Appeal and Error—Questions Reviewable—Mental Capacity—Undue Influence.
   Question of undue influence upon 56-year-old spinster in the matter of making her will in which her friend, a practical nurse, was left a substantial portion of her property is not discussed, where it appears to have been abandoned and decedent was found not to have had the mental capacity to make a will at time questioned instrument was executed.

---

References for Points in Headnotes
[1, 2] 57 Am Jur, Wills § 63 *et seq.*
[3] 3 Am Jur, Appeal and Error §§ 821, 823.

Appeal from Houghton; Brennan (Leo J.), J. Submitted January 7, 1953. (Docket No. 32, Calendar No. 45,654.) Decided March 10, 1953.

In the matter of the estate of Jennie Antila, deceased. Elvira Hanses presented the purported last will and testament for probate. John W. Antila and others objected thereto. On appeal in circuit court judgment was for contestants. Proponent appeals. Affirmed.

*Reino S. Koivunen,* for proponent.

*Joseph M. Donnelly* and *McCormack & Ryan,* for contestants.

BUTZEL, J. Jennie Antila, an unmarried woman about 56 years of age, died at Hancock, Michigan, on April 24, 1950, leaving as sole heirs at law 3 nephews, Edwin Anttila, Ansel Antila and John W. Antila, residents of Detroit, Michigan, the contestants of what purported to be her last will. The sole asset of the estate consists of a 60-acre tract of land bordering on Portage lake, between Houghton and Chassell, in Houghton county, Michigan, which she inherited from her father and where she lived alone for a number of years. Her parents, as well as almost all of her friends were Finnish or of Finnish descent. Her only schooling was at a Finnish school. She spoke Finnish but her knowledge of English was limited and her ability to read English with comprehension is a question in this case. The home on the 60 acres where she lived was in wretched condition. It was full of debris and badly in need of repairs. The roof had caved in some 4 years prior to her death but nevertheless she continued to live in the house. She cooked her meals outside on a wood cook stove the year around. She wrapped her legs

in blankets and rags during the winter in order to keep warm. She kept 5 cats in the house. It is conceded that she was an eccentric person. The social welfare department of Hancock county had from time to time advanced to her amounts aggregating $1,700. However it stopped giving her any relief after she refused a proposal to build a home for her use during her lifetime and pay her an annual income on condition that she would give it a deed to the farm in return. It was claimed that the tract of land was worth $20,000 at one time but the impression one gets from the testimony is that it would bring much less today, especially if it were sold at public sale.

In the latter part of 1949, she became ill and in January of 1950 she arranged with Mrs. Elvira Hanses of Hancock, Michigan, to go to the latter's home. Mrs. Hanses was a practical nurse and a friend of decedent. She fixed up a day bed for decedent and took care of her. During the early part of February, 1950, decedent went to the office of Mr. Messner, an attorney at Houghton, Michigan, for the purpose of making a will. According to his testimony, he took down notes in pencil on a piece of paper. He testified that decedent first wanted to leave 1/2 of her property to Mrs. Hanses and the other half to her 3 nephews, now the contestants, and with whom she had had but little association; that she represented the farm to be worth $20,000 but on her attorney's suggestion she concluded to leave $10,000 to Mrs. Hanses and the residue to her nephews; that she stated that she owed Mrs. Hanses for moneys loaned to her as well as for her nursing. A clause thereafter inserted in the will, which was drafted some 2 months later, provided:

"Third: I hereby give and bequeath to Elvira Hanses, my beloved and trusted friend, nurse and

provider, the sum of $10,000, which shall be in full satisfaction of any and all claims that the said Elvira Hanses might otherwise have for my maintenance, my nursing care and all money advances and the like heretofore and hereafter provided me, by her."

It further provided that the residue should go to the children of her only brother, then deceased, they being the 3 nephews hereinbefore mentioned; that the property was to be sold within 1 year. It named Mrs. Hanses as sole executrix. In accordance with a discussion that her attorney had had with her at the time she went to his office, the will further stated that anyone who contested the will should forfeit his share, which thereupon was to be added to the bequest to Mrs. Hanses. The will further provided that the attorney who drafted the will should be the legal adviser of the estate. No will was prepared at the time the pencil notes were made. The attorney left for Florida and Cuba a week or 10 days later and was gone for a month. He stated that he did not have time to prepare the will prior to his departure and that later after he did prepare it, he destroyed the notes. In October, 1948, he had drafted a lease for decedent, by the terms of which she rented a very small part of the farm for $50 a year. This was the only professional contact he had had with her. He evidently knew Mrs. Hanses, but just how well is not shown by the record. Some years previously he had prepared for her a claim of $700 or $800 against another estate for partial nursing services and board.

During the latter part of March, 1950, probably on the 27th or 28th, Dr. R. C. Whitmore, a doctor of long experience, was called to the home of Mrs. Hanses because of the very serious condition of decedent. He found that she had suffered a very severe paralytic stroke during the preceding night

and as a result her right side was totally paralyzed, her tongue thick, and he could not understand what she was trying to say very well as her throat was partially paralyzed. She was unable to swallow, was only semiconscious and her face was slightly contorted. By April 1, 1950, she began to pick up some, the throat condition had improved so that she was able to swallow a little fluid and when aroused could make some response to questions by nodding her head. The attorney had returned from the south around the middle of March, 1950. About April 1st, Mrs. Hanses called on him and informed him that decedent had suffered a paralytic stroke and was asking about a will which he was supposed to have drafted. She gave him the name of the doctor in attendance and after he drafted the will he telephoned Dr. Whitmore and asked him if the decedent was competent to execute a will. The doctor advised him that she was not, that he had better wait a few days.

On April 7, 1950, the attorney called at the home of Mrs. Hanses with a will he had drafted. Dr. Whitmore was summoned to see the patient and when he arrived there found the attorney with a will prepared along the lines previously indicated. The doctor subsequently stated that he found he had "dropped into a trap," since he felt that he was called only to witness the will and not for medical service. There is conflicting testimony as to the condition of decedent at that time. Her right hand was paralyzed; she was raised partially; her eyeglasses were put on; the attorney placed the pen in her left hand and guided it as a cross was made to indicate her signature. According to the attorney, a copy of the will was left with decedent but it had disappeared before the trial. There is contradictory testimony as to how much she could understand of what was going on. It was claimed that the will was

read to her in English and that she nodded her assent as to various questions put to her and that she was able to say the words yes and no. According to the testimony of the attorney, as they were leaving the house, he remarked to the doctor that decedent "was looking very good" and he saw no reason why she did not know exactly what she was doing, that the doctor's reply was "oh, sure," or words to that effect. Possibly there was some reason that prompted the attorney to make such a remark. The doctor evidently was not pleased with the way he became involved. He testified that he heard the attorney ask decedent whether she wanted to give Mrs. Hanses $10,000 and that she had answered yes and nodded her head; that she was able to speak an articulate yes or no. At the trial the doctor refused to testify as to decedent's degree of competency or comprehension, saying that he did not feel competent to judge the situation exactly. However he testified that she apparently was conscious of everything going on and gave reasonable answers to what was asked her. He again repeated that he was not able to state decedent's degree of competency or her ability to understand exactly what happened, but he did state that she gave no irrational answers and made no irrational statements. On cross-examination, however, he admitted stating to the attorney for contestants prior to decedent's death, that decedent did not have the mental capacity to make a will, and that at the time he went to the house he did not know that decedent was about to make a will; that he just signed as a matter of accommodation to the lawyer. Three other witnesses also testified that, when later the doctor was asked whether decedent was competent to make a will at the time, he replied, "Hell, no." The will was signed on the 7th of April, 1950. Another doctor of experience was called on the 12th of April. He found decedent lying on a cot, breathing

quite hard, paralyzed on the right side and also in a semicomatose state, unable to answer questions clearly or not at all, unable to retain food or drink, muscles on the right side of the face paralyzed involving the muscles of the face, eye, throat, chest, arm, tongue, part of the abdominal muscles, including the large and small intestines, right leg, and unable to perform the regular functions. He ordered her removed to the hospital where she died on April 24, 1950. Although 5 days elapsed from the time of the execution of the purported will until this other doctor took charge of decedent, the latter made the further statement, in answer to a hypothetical question, that:

"I would state that under this hypothetical question, owing to the fact that most people who do have a cerebral hemorrhage in late life, they are usually massive, and I would state from that fact she would be unable, probably almost from the day she had the stroke, continuously not be able to make any definite statements or make anything definite—in other words, her condition would be such that she would be practically the same as I saw her on the 12th—she would be practically the same from the day she got the stroke up until I saw her on the 12th. I am 50 years of age and have a large practice both medical and surgical in this community."

While it is true that 5 days elapsed between the time of the making of the will and when this witness first saw the patient, and during that time it might not be impossible for decedent to have had a lucid interval, nevertheless, in view of the second doctor's testimony, it was highly improbable. The case differs from those upon which proponents' attorneys rely in their brief. We believe that the second doctor's testimony is of some importance, especially in view of the statements which the first doctor made subsequent to the signing of the purported will. It

would serve no useful purpose to further review the conflicting testimony. The testimony indicates that decedent had only a limited knowledge of the English language, was somewhat illiterate and was largely under the domination and influence of Mrs. Hanses, who seemed to be partly in charge of the situation. Disinterested witnesses testified that decedent was unable to read English. One witness stated that she herself spoke only English and that she and decedent were not always able to understand each other in conversation. Testamentary capacity requires an understanding of the disposition being made of the property at the time the will is executed.

The case was tried without a jury. The circuit judge refused to admit the will to probate upon the ground that decedent did not possess the requisite mental capacity to make a will. A reading of the record leads us to the same conclusion and we hold that there is very strong and probative testimony supporting the finding of the judge and that the evidence does not preponderate against it. The question of undue influence was raised on cross appeal but was evidently abandoned. In view of the finding of the judge it is not even necessary to discuss that question. The judge stated that inasmuch as decedent did not have the mental capacity to make a will, other questions raised by contestants need not be considered. We are in accord with the judgment disallowing the will and ordering that the judgment be certified to the probate court for Hancock county and the cause be remitted to the probate court for further proceedings.

The judgment is affirmed, with costs to appellees.

DETHMERS, C. J., and ADAMS, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.